**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL NAILOR, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LEGACY PROFESSIONALS LLP,<br><br>Defendant. | Case No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Michael Nailor ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Legacy Professionals LLP ("Legacy" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Legacy for its failure to secure and safeguard Plaintiff's and Class members' personally identifying information ("PII") and personal health information ("PHI"), including names, Social Security numbers, driver's license/state ID numbers, medical treatment information, and health insurance information.

2. Legacy is an accounting firm that specializes in providing services to employee benefit plans, labor organizations, not-for-profits, and commercial clients.

3. In or about April of 2024, an unauthorized third party gained access to Legacy's network systems and obtained files containing the PII/PHI of Legacy's clients, including Plaintiff and Class members (the "Data Breach").

4. Legacy owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Legacy breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its clients' customers' PII/PHI from unauthorized access and disclosure.

5. As a result of Legacy's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred in or about April of 2024.

6. Plaintiff, on behalf of himself and all other Class members, assert claims for negligence, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Michael Nailor***

7. Plaintiff Michael Nailor is a citizen of Illinois.

8. Plaintiff was a customer of one of Legacy's clients.

9. At all relevant times, Legacy stored and maintained Plaintiff Nailor's PII/PHI on its network systems, including the systems impacted in the Data Breach.

10. Plaintiff received a letter from Legacy notifying him that his PII/PHI was in the files accessed in the Data Breach.

11. Upon learning of the Data Breach, Plaintiff spent time and effort researching the Data Breach, monitoring his financial accounts for signs of fraud, and changing passwords to his accounts.

12. Plaintiff became the victim of identity theft as a result of the Data Breach. After the Data Breach occurred, Plaintiff experienced multiple fraudulent charges on his credit card, which forced him to get a new card.

13. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; and deprivation of the value of his PII/PHI.

***Defendant Legacy Professionals LLP***

14. Defendant Legacy Professionals LLP is a Delaware limited liability partnership with its principal place of business located at 4 Westbrook Corporate Ctr., Suite 700, Westchester, IL 60154. It may be served through its registered agent: C T Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16. This Court has general personal jurisdiction over Legacy because it is organized under the law of this State and maintains its principal place of business in this District.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Legacy's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Legacy and the Data Breach*

18. Legacy is a "niche-focused certified public accounting firm . . . serving employee benefit plans, labor organizations, not-for-profits, and others."[1] Legacy provides "audit, accounting, tax, and other related services to clients throughout the country."[2]

19. On its website, Legacy states, "We promise not to sell or disclose to any outside party . . . any of the information we obtain from you. As your most trusted business partner, we recognize that we have a responsibility to protect this information."[3]

20. In the regular course of its business, Legacy collects and maintains the PII/PHI of its clients' customers, including Plaintiff and Class members.

21. In or about April, 2024, Legacy "became aware of potentially suspicious activity affecting data stored on our computer network."[4] An investigation revealed in November, 2024, that "certain files had been taken from Legacy servers by an unauthorized actor."[5] The information affected in the Data Breach includes names, Social Security numbers, driver's license/state ID numbers, medical treatment information, and health insurance information.[6]

---

[1] *Legacy Professionals*, LEGACY PROS., https://www.legacycpas.com/ (last accessed Mar. 13, 2025).
[2] *About Us*, LEGACY PROS., https://www.legacycpas.com/about-us (last accessed Mar. 13, 2025).
[3] *Privacy Policy*, LEGACY PROS., https://www.legacycpas.com/privacy-policy (last accessed Mar. 13, 2025).
[4] *Security Notice*, LEGACY PROS., https://www.legacycpas.com/security-notice (last accessed Mar. 13, 2025).
[5] *Id.*
[6] *Id.*

22. The LockBit ransomware group claimed responsibility for the Data Breach.[7] LockBit "is perhaps the most infamous ransomware gang in recent years," and utilizes malware that "can both lock down infected computers and steal data."[8] LockBit engages in "double extortion," where data "is exfiltrated before encryption, allowing attackers to threaten public leaks if ransom demands are not met."[9] In double extortion ransomware attacks, the cybercriminals "exfiltrate a victim's sensitive data in addition to encrypting it," which makes this type of attack "especially dangerous."[10] LockBit often publishes stolen personal data on dark web leak sites, especially when targeted entities do not pay a ransom.[11]

23. While Legacy learned of the Data Breach in or about April, 2024, and learned that PII/PHI had been accessed and removed in or about November, 2024, Legacy waited until approximately February 27, 2025—nearly 11 months after first discovering the Data Breach and nearly four months after discovering PII/PHI was stolen—to begin notifying its clients' customers that the Data Breach occurred and that their PII/PHI was in the hands of cybercriminals.[12]

---

[7] Paul Bischoff, *Accounting firm Legacy Professionals notifies 191K people of data breach that compromised SSNs, health info*, COMPARITECH (Mar. 5, 2025), https://www.comparitech.com/news/accounting-firm-legacy-professionals-notifies-191k-people-of-data-breach-that-compromised-ssns-health-info/.

[8] *Id.*

[9] Giftson Joshua, *Key Security Flaws That Make Enterprises Vulnerable to LockBit Ransomware*, SECPOD (Mar. 6, 2025), https://www.secpod.com/blog/lockbit-rise-exploited-flaws/.

[10] *What Is Double Extortion Ransomware?*, ZSCALER, https://www.zscaler.com/resources/security-terms-glossary/what-is-double-extortion-ransomware (last accessed Mar. 13, 2025).

[11] *See* Joshua, *supra* note 9; Zeba Siddiqui & James Pearson, Explainer: *What is Lockbit? The digital gang shutdown after a cybercrime spree*, REUTERS (Feb. 20, 2024 1:42 PM), https://www.reuters.com/technology/cybersecurity/what-is-lockbit-digital-extortion-gang-cybercrime-spree-2023-11-10/.

[12] *See Legacy Professionals, LLP*, OFF. ME. ATT'Y GEN. (Feb. 28, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/869d41de-c894-49f3-be2a-639077db5b36.html (last accessed Mar. 13, 2025).

24. Legacy's failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Legacy Knew that Criminals Target PII/PHI***

25. At all relevant times, Legacy knew, or should have known, that the PII/PHI that it collected and stored was a target for malicious actors. Despite such knowledge, Legacy failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyberattacks that it should have anticipated and guarded against.

26. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[13]

27. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in

[13] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

2024.[14] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[15]

28. PII/PHI is a valuable property right.[16] The value of PII/PHI as a commodity is measurable.[17] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[18] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[19] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

29. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[14] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Mar. 13, 2025).

[15] *See id*.

[16] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[17] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[18] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[19] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

30. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[20] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[21]

31. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[22] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[23]

32. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[24] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[25]

---

[20] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[21] *Id.*
[22] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[23] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[24] Steager, *supra* note 17.
[25] *Id.*

33. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[26]

34. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

35. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[27] [28]

36. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

[26] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[27] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 26, 2024).

[28] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[29]

37. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[30]

38. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[31] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[32] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[33] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[34]

[29] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[30] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 26, 2024).

[31] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[32] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 20.

[33] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Sept. 10, 2024).

[34] *Id*.

39. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [35]

40. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[36]

[35] *See* Dixon & Emerson, *supra* note 28.
[36] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

41. It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

42. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

43. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

44. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

45. Excluded from the Class are Legacy Professionals, LLP, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

46. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

47. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Legacy has reported that the Data Breach affected approximately 4,939 persons in Texas alone.[37]

48. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

e. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

49. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual

[37] *Data Security Breach Reports*, Att'y Gen. Tex. (Mar. 4, 2025), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed Mar. 13, 2025).

questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

50. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

51. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

52. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I
## NEGLIGENCE

53. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Legacy owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

55. Legacy knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. Legacy knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

56. Given the nature of Legacy's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Legacy should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

57. Legacy's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

58. Legacy's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Legacy, of failing to employ reasonable measures to protect and secure PII/PHI.

59. Legacy's duties also arise from the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS. 530/45.

60. Additionally, under 815 ILCS 530/10, Legacy had a duty to "notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach . . . in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10.

61. Legacy violated HIPAA Privacy and Security Rules, Section 5 of the FTCA, and IPIPA by failing to use reasonable measures to protect Plaintiffs' and Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Legacy's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and Class members.

62. Legacy's violation of IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA constitutes negligence per se.

63. Plaintiffs and Class members are within the class of persons that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to protect.

64. The harm occurring as a result of the Data Breach is the type of harm that IPIPA, HIPAA Privacy and Security Rules, and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of

their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

65. Legacy breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

66. It was reasonably foreseeable to Legacy that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

67. But for Legacy's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

68. As a result of Legacy's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to

their PII/PHI which remains in Legacy's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

**COUNT II**
**UNJUST ENRICHMENT**

69. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70. Plaintiff and Class members conferred a monetary benefit upon Legacy in the form of monies paid to Legacy's clients for services, which those clients used in turn to pay for Legacy's services, and through the provision of their PII/PHI, which was necessary for Legacy to operate its business.

71. Legacy accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class Members. Legacy also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to carry out its business and provide services to its clients.

72. As a result of Legacy's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

73. Legacy should not be permitted to retain the money belonging to Plaintiff and Class members because Legacy failed to adequately implement the data privacy and security procedures for themselves that Legacy and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

74. Legacy should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT III**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")**

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Legacy offered and continues to offer accounting services in the State of Illinois.

77. Plaintiffs and Class members received services from Legacy's clients for personal, family, or household purposes.

78. Legacy engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure its clients' customers' PII/PHI in a manner that complied with applicable laws, regulations, and industry standards.

79. Legacy's duties also arise from the Illinois Personal Information Protection Act, 815 ILCS 530/45(a) which requires:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

815 ILCS 530/45. Legacy violated this duty by failing to implement reasonably secure data security policies.

80. Legacy further violated the ICFA by failing to notify its clients' customers of the Data Breach in a timely manner. The Illinois Personal Information Protection Act requires

entities that experience a data breach to notify Illinois residents "in the most expedient time possible and without unreasonable delay." 815 ILCS 530/10. Violation of the Illinois Personal Information Protection Act constitutes an unlawful practice under the ICFA. 815 ILCS 530/20.

81. Due to the Data Breach, Plaintiffs and Class members have lost property in the form of their PII/PHI. Further, Legacy's failure to adopt reasonable practices in protecting and safeguarding its clients' customers' PII/PHI will force Plaintiffs and Class members to spend time or money to protect against identity theft. Plaintiffs and Class members are now at a higher risk of medical identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Legacy's practice of collecting and storing PII/PHI without appropriate and reasonable safeguards to protect such information.

82. As a result of Legacy's violations of the ICFA, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Legacy's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 13, 2025

Respectfully submitted,

/s/ Ben Barnow

Ben Barnow (IL Bar No. 0118265)
Anthony L. Parkhill (IL Bar No. 6317680)
Riley W. Prince (IL Bar No. 6339536)
Nicholas W. Blue (IL Bar No. 6343317)
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630

Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com
rprince@barnowlaw.com
nblue@barnowlaw.com

*Attorneys for Plaintiff*